UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Edwin C. Johnson,<br>    Plaintiff,<br><br>v.<br><br>Equifax Information Services, LLC; and<br>DOES 1 through 100 inclusive,<br><br>    Defendants. | CASE NO.  5:22-cv-1006 |

COMES NOW Plaintiff **EDWIN C. JOHNSON** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2. Defendant Equifax Information Services, LLC ("Equifax") is not reporting Plaintiff's Barclays Bank Delaware ("Barclays") account accurately as paid in full and satisfied.

3. Equifax is not reporting Plaintiff's Merrick Bank ("Merrick") account accurately as paid in full and satisfied.

4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. Creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting debt information. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

6. This was not the intent of Congress when it enacted the Fair Credit Reporting Act.

## JURISDICTION & VENUE

7. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

8. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

9. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

10. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

11. Plaintiff alleges that the Barclays account was current, paid in full, and fully satisfied in or about May of 2018, and thus should not have been reported with a past due payment status.

12. Despite the fact the account was satisfied, Equifax reported the Barclays account with a past due payment status which is patently incorrect and misleading.

13. Plaintiff alleges that the Merrick account was current, paid in full, and fully satisfied in or about May of 2018, and thus should not have been reported with a past due payment status.

14. Despite the fact the account was satisfied, Equifax reported the account with a past due payment status which is patently incorrect and misleading.

15. Plaintiff alleges that it is patently incorrect and misleading for a debt which was current, paid in full, and fully satisfied to be reported on a credit report with a past due payment status as this reporting makes it appear as if the debt defaulted and remained unpaid at closure.

16. Further, despite the fact the Barclays and Merrick accounts were each paid, the tradelines do not mention the word "paid" anywhere.

17. Not reporting a paid account as paid is misleading. Equifax's reporting makes the accounts appear as if they were last reported with an outstanding and past due amount, which is patently incorrect and misleading.

18. Plaintiff alleges he did not default on his Barclays account.

19. Plaintiff alleges he paid his Barclays account in full.

20. Plaintiff alleges his Barclays account was brought to a zero-balance due to payment of the debt.

21. Plaintiff alleges his Barclays account was not a student loan and it was not defaulted to the federal government.

22. Plaintiff alleges the last status on his Barclays account prior to final reporting was "current".

23. Plaintiff alleges he did not default on his Merrick account.

24. Plaintiff alleges he paid his Merrick account in full.

25. Plaintiff alleges his Merrick account was brought to a zero-balance due to payment of the debt.

26. Plaintiff alleges his Merrick account was not a student loan and it was not defaulted to the federal government.

27. Plaintiff alleges the last status on his Merrick account prior to final reporting was "current".

28. Courts make a distinction on reporting of payment statuses for a paid account versus a defaulted, foreclosed, repossessed, or otherwise unpaid closed account.

29. Reporting a paid account with a past due payment status is inaccurate and misleading as it appears the account was closed with an outstanding amount or defaulted without being paid.

30. Accurate reporting, as required by the FCRA, cannot equate reporting of a defaulted debt to that of a paid debt.

31. Reporting a paid debt as if it defaulted and went unpaid at closure is misleading and inconsistent with the legislative intent of the FCRA.

32. To be clear, Plaintiff is not alleging an inaccurate monthly payment is reporting, nor is he alleging the accounts are misleading as it makes the debt appear "currently past due". Plaintiff is alleging his accounts were not past due at the time each was last reported as past due.

33. Plaintiff alleges that each and every Defendant is familiar with the FCRA requirements and subscribes thereto.

34. Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

35. Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his Credit Score.

36. In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

37. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    FICO, Inc.**

38. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

39. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

40. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

41. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

42. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See* https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

43. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

44. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

45. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

46. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

47. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

48. Each of the five (5) factors is weighted differently by FICO.

49. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

50. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

51. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

52. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

53. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

54.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

55.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.      e-OSCAR**

56.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

57.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

58.     The ACDV contains codes next to certain data fields associated with a credit file.

59.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

60.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

61. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

C. **Plaintiff's Credit Reports Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

62. On January 20, 2022, Plaintiff ordered an Equifax credit report to ensure proper reporting by Plaintiff's creditors (the "January 20 Credit Report").

63. Plaintiff noticed adverse tradelines in his January 20 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

64. Plaintiff then disputed the inaccurate tradelines regarding the account with Barclays and the account with Merrick via certified mail to Equifax on or about January 26, 2022 (the "First Dispute Letter").

65. Plaintiff's First Dispute Letter specifically put Equifax on notice that Plaintiff's Barclays account should not be listed as past due as it has a zero balance, is closed, and that Plaintiff's account should be updated.

66. Plaintiff's First Dispute Letter specifically put Equifax on notice that Plaintiff's Merrick account should not be listed as past due as it has a zero balance, is closed, and that Plaintiff's account should be updated.

67. On March 10, 2022, Plaintiff ordered a second Equifax credit report to determine if his accounts were updated.

68. Plaintiff then disputed the inaccurate tradelines regarding the account with Barclays and the account with Merrick via certified mail to Equifax on or about March 31, 2022 (the "Second Dispute Letter").

69. Plaintiff's Second Dispute Letter specifically put Equifax on notice that Plaintiff's Barclays account should not be listed as past due as it was paid in full in May of 2018, and that Plaintiff's account should be updated.

70. Plaintiff's Second Dispute Letter specifically put Equifax on notice that Plaintiff's Merrick account should not be listed as past due as it was paid in full in May of 2018, and that Plaintiff's account should be updated.

71. Plaintiff's Second Dispute Letter included a bank statement proving the final payments made on the Barclays and Merrick accounts was made in May of 2018.

72. Plaintiffs First Dispute Letter and Plaintiff's Second Dispute Letter referred to as the "Dispute Letters".

73. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

74. Plaintiff is informed and believes that Equifax received Plaintiff's First Dispute Letter and, in response, failed to send Plaintiff's disputes to Barclays and Merrick, as the data furnishers, via an ACDV through e-OSCAR.

75. Plaintiff is informed and believes that Equifax received Plaintiff's Second Dispute Letter and, in response, failed to send Plaintiff's disputes to Barclays and Merrick, as the data furnishers, via an ACDV through e-OSCAR.

76. On July 20, 2022, Plaintiff ordered a third Equifax credit report to determine if his accounts were updated.

    a.    **Inaccuracy – Barclays, Merrick**

77. Despite actual knowledge, Equifax continued to report Plaintiff's Barclays account, ending in 2197, with a payment status of "Not more than two payments past due" and with a "30" for 30 days past due in the payment history for May of 2018. The tradeline also nowhere mentions the word "paid" and shows the reporting was updated "April 28, 2022." This tradeline is patently inaccurate as the account was paid in full and fully satisfied on or about May of 2018.

78. Despite actual knowledge, Equifax continued to report Plaintiff's Merrick account, ending in 3453, with a payment status of "Not more than three payments past due" and nowhere mentions the word "paid". The tradeline reporting was updated "April 28, 2022." This tradeline is patently inaccurate as the account was paid in full and fully satisfied on or about May of 2018.

79. Plaintiff alleges that Equifax did not investigate whether Plaintiff previously satisfied the Barclays account or the Merrick account.

80. Equifax did not update the tradelines to reflect that Plaintiff satisfied the accounts, and that neither was past due at the time of final reporting.

81. Plaintiff provided notice to Equifax on two, separate occasions that he was disputing the inaccurate and misleading information, but Equifax failed to conduct a reasonable investigation of the information as required by the FCRA.

82. The most basic investigation would include a simple review of the provided proof of payment verification on each compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA regarding how to report a debt paid in full.

83. Plaintiff alleges that Equifax did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

84. If Equifax reviewed such standards, or the disputes and/or payment verification regarding Plaintiff's accounts, Equifax would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

85. By continuing to report Plaintiff's accounts as described herein, it appears to third parties viewing Plaintiff's credit report that Plaintiff did not pay off the debt in full but instead defaulted.

86. Equifax's reporting on the accounts makes it appears as if Plaintiff had an outstanding, unpaid balance at the time of final reporting on the accounts, which is inaccurate.

87. Past due debts are far more injurious to a credit score than a debt paid in full and satisfied. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the Credit Score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

88. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment statuses reported by Equifax on the accounts is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

89. This type of reporting has been proven to be inaccurate, misleading, and harmful to other consumers in the same position as Plaintiff. *See Macik v. JPMorgan Chase Bank, N.A.*, No. G-14-44, 2015 WL 12999728, at 1 (S.D. Tex. May 28, 2015), *report and recommendation adopted by Macik v. Trans Union LLC*, No. 14-44, 2015 WL 12999727 (S.D. Tex. July 31, 2015)

(lender's "automated underwriting system" denied mortgage due to closed account with zero balance listed with a past due payment status; however, plaintiff had paid the debt. Jury returned verdict in favor of consumer).

90. The lack of investigation and reporting of inaccurate and incomplete information by Equifax is unreasonable.

**D.  Damages**

91. Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

92. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

93. Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by Equifax. Further, Plaintiff's diminished creditworthiness, resulting from Equifax's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

94. Equifax's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendants and Does 1-100)**

95. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Equifax Failed to Assure Credit Reporting Accuracy**

96. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

97. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Barclays account as described herein.

98. Equifax knew, or should have known, (1) that the Barclays account was current, paid in full, and fully satisfied in May of 2018, and (2) that the account should not have been reported with a payment status of "Not more than two payments past due" as the debt was current, paid in full, and fully satisfied in or about May of 2018. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

99. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Merrick account as described herein.

100. Equifax knew, or should have known, (1) that the Merrick account was current, paid in full, and fully satisfied in May of 2018, and (2) that the account should not have been reported with a payment status of "Not more than three payments past due" as the debt was current, paid in full, and fully satisfied in or about May of 2018. Further, Equifax knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

101. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the reporting that Equifax allowed.

102. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.     Willful Violations**

103. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

104. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

---

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019).

105. To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

106. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

107. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

108. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

109. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

110. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

111. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

112. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

113. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

### (Against Defendants and Does 1-100)

114. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

A.  **Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

115.  Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Barclays account.

116.  Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Merrick account.

117.  Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

118.  Equifax is not a passive entity bound to report whatever information a data furnisher provides.

119.  Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

120.  Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

121.  Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

122.  Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Barclays account correctly.

123.  Had Equifax conducted a proper investigation, it could have closed or updated the Barclays debt by adding a notation on the credit report to show that the debt was in fact fully satisfied and not past due at final reporting. However, Equifax continued to report the account as described herein.

124.  Plaintiff alleges that Equifax did not send an ACDV to Barclays to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

125.  Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Merrick account correctly.

126. Had Equifax conducted a proper investigation, it could have closed or updated the Merrick debt by adding a notation on the credit report to show that the debt was in fact fully satisfied and not past due at final reporting. However, Equifax continued to report the account as described herein.

127. Plaintiff alleges that Equifax did not send an ACDV to Merrick to confirm accurate reporting on its account. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax did not delete or correct the tradeline or conduct an investigation.

128. Equifax, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

129. In the alternative, if Equifax deemed Plaintiff's Dispute Letter "frivolous or irrelevant" under 15 U.S.C. 1681i(a)(3), Equifax failed to notify Plaintiff of such determination as required by 15 U.S.C. 1681i(a)(3)(B). As Plaintiff received no such notice from Equifax, Plaintiff alleges Equifax deemed his Dispute Letter valid, and thus triggered its obligations under 15 U.S.C. 1681i(a)(1) and (2)(A), for which it failed to comply.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

130. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Review and Consider all Relevant Information**

131. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

132. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

133. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

134. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

135. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

136. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Delete Disputed and Inaccurate Information**

137. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

138. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

139. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

140. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

141. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

142. WHEREFORE, Plaintiff prays for judgment as follows:
    a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
    b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
    c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e. For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f. For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: September 14, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of this matter by jury.

|  |  |
|---|---|
|  | **SCHUMACHER LANE PLLC** |
| Dated: September 14, 2022 | */s/ Kyle Schumacher*<br>Kyle Schumacher<br>Attorneys for Plaintiff |